UNPUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 07-1513

ROBERT M. MOORE,

            Plaintiff – Appellant,

      v.

MICHAEL B. MUKASEY, Attorney General,

            Defendant – Appellee.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  Gerald Bruce Lee, District Judge.  (1:06-cv-00602-GBL-BRP)

Argued:  September 24, 2008          Decided:  December 30, 2008

Before MOTZ, GREGORY, and SHEDD, Circuit Judges.

Affirmed by unpublished per curiam opinion.  Judge Gregory wrote a dissenting opinion.

**ARGUED:** Janice F. Willis, Fairfax, Virginia, for Appellant. Lauren Anne Wetzler, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.  **ON BRIEF:** Chuck Rosenberg, United States Attorney, Ralph Andrew Price, Jr., Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Robert M. Moore, an African-American male, alleges that his former employer, the United States Drug Enforcement Administration (the "DEA"), denied him a promotion because of his race and gender in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq. Moore now appeals the district court's order granting summary judgment to the United States Attorney General (the "Government"). For the reasons set forth below, we affirm the district court's judgment.

I.

The following facts are presented in the light most favorable to Moore. See Howard v. Winter, 446 F.3d 559, 562 n.2 (4th Cir. 2006). Moore was employed by the DEA from 1985 until he retired in 2004. At all times relevant to this appeal, Moore was a GS-13 Information Technology Specialist.

Deborah Roberts, a white female – and the DEA employee who received the challenged promotion at issue in this appeal – became a GS-13 Information Technology Specialist with the DEA in 1998. Prior to accepting that position, Roberts was employed as a Programmer Analyst/Senior Consultant with a government contractor from 1990-1998.

2

In January 2003, one of Roberts' and Moore's supervisors, Dennis McCrary, a white male, temporarily promoted Roberts to Acting Unit Chief of the DEA's Enterprise and Field Systems Unit (the "SISE"). At the time, Roberts was a GS-13 employee in SISE and the temporary promotion, which was only scheduled to last 120 days, elevated her to the GS-14 pay scale. The permanent SISE Unit Chief position was vacant because McCrary had reassigned the Unit Chief, Kenneth Tyskowski, a white male, to another section. In explaining why he gave Roberts the temporary promotion, McCrary stated that "she had some of the more visible and difficult projects in that organization and she was doing them very well." J.A. 326-27.

McCrary terminated Roberts' promotion in May 2003 to comply with federal regulations requiring that temporary details lasting longer than 120 days be subject to a merit promotion program. The salary increase associated with Roberts' temporary promotion also ended in May 2003, and she was returned to GS-13 pay. However, McCrary allowed Roberts to continue performing the duties of Acting Unit Chief until November 2003. During this time period, Moore told McCrary that it would be unfair if he did not allow other employees to serve as Acting Unit Chief. McCrary replied that "[l]ife isn't fair." J.A. 788. McCrary later explained that he allowed Roberts to continue serving in an acting capacity "to maintain continuity and reduce turmoil"

in the unit.  J.A. 392.  While serving as Acting Unit Chief, Roberts supervised employees who would ultimately compete with her for the permanent Unit Chief position, and she had the opportunity to attend and participate in certain management meetings.

In August 2003, the DEA sought applicants to fill the SISE Unit Chief position on a permanent basis.  One of the DEA's Human Resources Specialists advertised the vacancy, reviewed all of the applications, and compiled a "best qualified list" ("BQL") for the vacancy.  The BQL listed all of the applicants who possessed at least the minimum qualifications necessary for the permanent position.  In this case, the BQL listed Roberts, Moore, and five other individuals: Patrick Duffy (white male), Terry Ford (African-American male), Evelyn Kelley (African-American female), Dorretha Tumlin (African-American female), and Mark Kirksey (African-American male).

Next, one of the DEA's Unit Chiefs, Ruth Torres (white female) convened an interview/evaluation panel (the "Panel") to interview the seven candidates and make a hiring recommendation to McCrary.  Torres selected three other DEA Unit Chiefs — one white male, one African-American female, and one Asian-American male – to serve on the Panel with her.  The Panel developed interview questions and asked each of the seven candidates the

4

same questions. After every interview, each Panel member independently rated the candidates' responses to the questions.

After completing the interviews, the Panel ranked all seven candidates. The Panel unanimously agreed that Roberts was one of the top two candidates; specifically, two panelists ranked Roberts first and two panelists ranked her second. The Panel concluded that Roberts had in-depth working knowledge, experience, and managerial potential, which she demonstrated through her resume, interview, and work experience. J.A. 229-30, 377-79. The Panel also concluded that Roberts demonstrated her ability to manage multiple complex tasks in a highly efficient and effective manner. Id. Ultimately, the Panel recommended three candidates to McCrary: Roberts, Tumlin, and Kirksey. The Panel did not rank Moore as one of the top three candidates, and it did not recommend him to McCrary for the promotion.

Upon receiving the Panel's recommendation, McCrary ranked the three candidates in order of his preference: (1) Roberts, (2) Tumlin, and (3) Kirksey. McCrary then forwarded this list to his supervisor who allowed him to promote Roberts to SISE Unit Chief. Roberts was promoted in November 2003.

After exhausting his administrative remedies, Moore filed this action alleging that he was intentionally discriminated against and denied a promotion to the SISE Unit Chief position

because of his race and gender. In response, the Government moved for summary judgment, arguing that Moore was not denied a promotion or otherwise discriminated against because of his race or gender. The district court entered summary judgment in favor of the Government on the grounds that (1) the DEA offered legitimate, non-discriminatory reasons for not promoting Moore, and (2) Moore failed to establish that the DEA's stated reasons were pretext for race or gender discrimination. Moore timely appealed.

## II.

"We review the district court's order granting summary judgment de novo, viewing the facts in the light most favorable to, and drawing all reasonable inferences in favor of, the nonmoving party." Garofolo v. Donald B. Heslep Assocs., Inc., 405 F.3d 194, 198 (4th Cir. 2005). At the same time, however, such inferences must "fall within the range of reasonable probability and not be so tenuous as to amount to speculation or conjecture." Thompson Everett, Inc. v. Nat'l Cable Adver., L.P., 57 F.3d 1317, 1323 (4th Cir. 1995).

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."

6

Fed. R. Civ. P. 56(c). The relevant inquiry in a summary judgment analysis is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986). Indeed, there must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative," summary judgment should be granted. Id. at 249-50 (citations omitted).

III.

A.

In general, a Title VII plaintiff may defeat summary judgment through one of two avenues of proof. First, a plaintiff may establish through direct or circumstantial evidence that race or gender was a "motivating factor" in the adverse employment action. Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 284 (4th Cir. 2004) (en banc). Second, a plaintiff may proceed under the "burden-shifting framework" adopted by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Hill, 354 F.3d at 285, 298.

7

On appeal, Moore confines his argument to the McDonnell Douglas burden-shifting framework. Under McDonnell Douglas, the plaintiff bears the initial burden of establishing, by a preponderance of the evidence, a prima facie case of unlawful discrimination. Id. at 285. If the plaintiff carries this initial burden, then "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action." Id. "This burden, however, is a burden of production, not persuasion." Holland v. Washington Homes, Inc., 487 F.3d 208, 214 (4th Cir. 2007). "Assuming the employer meets this burden of production, 'the McDonnell Douglas framework-with its presumptions and burdens-disappear[s], and the sole remaining issue [is] discrimination vel non.'" Hill, 354 F.3d at 285 (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142-43 (2000)). In other words, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's stated reasons for taking the employment action were not its true reasons, but rather "pretext" for unlawful discrimination. Hill, 354 F.3d at 285.

Even under the McDonnell Douglas framework, however, the plaintiff bears the ultimate burden of demonstrating that the employer's actions were discriminatory. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507-08, 511-12 (1993). Indeed, "[r]egardless of the type of evidence offered by a plaintiff as

8

support for her discrimination claim (direct, circumstantial, or evidence of pretext), . . . [t]he ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." Hill, 354 F.3d at 286 (internal quotation marks omitted).

B.

Applying these principles to this case, Moore can establish a prima facie case of discriminatory failure to promote by establishing: (1) he is a member of a protected group, (2) he applied for the position in question, (3) he was qualified for the position, and (4) the DEA rejected his application under circumstances giving rise to an inference of unlawful discrimination. Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 268 (4th Cir. 2005). For purposes of our analysis, we will assume, without deciding, that Moore has established a prima facie case of discrimination.

Under McDonnell Douglas, the burden then shifts to the DEA to articulate a legitimate, nondiscriminatory reason for selecting Roberts instead of Moore. In this regard, the Government states that Roberts was a better qualified candidate. It supports this assertion by noting, inter alia, (1) Roberts was highly recommended to McCrary by the Panel; (2) Roberts had in-depth working knowledge, experience, and managerial

9

potential, which she demonstrated through her resume, interview, and work experience; and (3) Moore was not among the top three candidates recommended by the Panel.

As a threshold matter, Moore contends that summary judgment should not have been granted because the Government failed to rebut his prima facie case. Moore argues that the Government's articulated reason for not promoting him – namely, that Roberts was better qualified – is not a legitimate, nondiscriminatory reason because it is not credible. In Moore's view, Roberts gained her experience and qualifications in an unlawful manner and, therefore, she was not actually a better qualified candidate.[1] Consequently, Moore argues, there is no need to proceed to the pretext stage of the McDonnell-Douglas analysis. In pressing this claim, however, Moore misapprehends the Government's burden. As noted above, the Government's burden at this stage of the McDonnell Douglas analysis is one of production, not persuasion; it "can involve no credibility assessment." St. Mary's, 509 U.S. at 509. Rather, the Government need only articulate "reasons for its actions which, if believed by the trier of fact, would support a finding that

---

[1] Moore alleges that Roberts gained her experience and qualifications for the Unit Chief position in an unlawful manner because McCrary elevated her to the Acting Unit Chief position and allowed her to stay in that position longer than 120 days in violation of federal law. Without this experience, Moore contends, Roberts would not have been better qualified.

10

unlawful discrimination was not the cause of the employment action." Id. at 507. Applying this standard, we conclude that the Government satisfied its burden. If Roberts was better qualified than Moore, then promoting her on that basis would be legitimate and non-discriminatory.

Because the Government satisfied its burden under McDonnell Douglas, the burden now shifts to Moore to establish by a preponderance of the evidence that the Government's stated reasons were pretext for unlawful discrimination. "A plaintiff alleging a failure to promote can prove pretext by showing that he was better qualified, or by amassing circumstantial evidence that otherwise undermines the credibility of the employer's stated reasons." Heiko v. Colombo Savings Bank, F.S.B., 434 F.3d 249, 259 (4th Cir. 2006). Moore offers several arguments which, in his view, establish that the Government's stated reasons were pretext. Mindful of our obligation to draw all reasonable, non-speculative inferences in Moore's favor, we conclude, for the reasons set forth below, that Moore has not carried his burden.

First, Moore contends the Government's stated reasons were pretext because he was better qualified than Roberts. Moore

11

argues that he had a superior educational background,[2] had been employed by the federal government for a longer period of time, and had experience supervising enlisted reserve members as a Leading Petty Officer of a Naval Reserve Unit.  However, Moore undercuts this argument by stating that Roberts' applicable work experience  – and, in particular, her experience serving as Acting Unit Chief –  "made Roberts as qualified as Moore." Appellant's Br. at 20 (emphasis added); id. at 13 (stating that Roberts' experience placed her "on a level playing field with Moore").  Under our case law, a Title VII plaintiff cannot rely on his qualifications to establish pretext if he asserts that his qualifications are similar or only slightly superior to those of the person ultimately selected for promotion.  See, e.g., Heiko, 434 F.3d at 261 ("When a plaintiff asserts job qualifications that are similar or only slightly superior to those of the person eventually selected, the promotion decision remains vested in the sound business judgment of the employer.").

---

[2] Moore earned an Associate's Degree in Computer Science from the University of the District of Columbia and a Bachelor's Degree in Business Management from the University of Maryland. Moore also served as Leading Petty Officer of a Naval Reserve Unit from 1984-1995 where he supervised 15 other reserve members.  Roberts earned a high school diploma in 1974 and had 66 hours towards an Associate's Degree in Business Administration at Charles County Community College.

12

Further, Moore cannot rely on his qualifications to establish pretext because he has not presented evidence that would allow a reasonable jury to conclude that he was better qualified than Roberts. The undisputed facts establish that both Moore and Roberts were at least minimally qualified to serve as SISE Unit Chief. It is also undisputed that the Panel – which was composed of a diverse group of four current DEA Unit Chiefs – interviewed all seven candidates and unanimously concluded that Roberts was one of the top two candidates and recommended her for the promotion. Moreover, the Panel rated Roberts, but not Moore, "highly in the key areas of project management, potential for leadership and overall understanding of [applicable] . . . business processes." J.A. 229. It is also undisputed that the Panel did not rank Moore as one of the top three candidates for the promotion. Even construed in the light most favorable to Moore, our case law makes plain that Moore's self-assessment of his superior aptitude for the position fails to rebut the Government's legitimate explanation. See, e.g., Anderson, 406 F.3d at 269 (holding that a Title VII plaintiff "cannot establish her own criteria for judging her qualifications for the promotion" but "must compete for the promotion based on the qualifications established by her employer").

13

Next, Moore contends that McCrary's decision to use the Panel establishes pretext. In particular, Moore alleges that the Panel was not a lawful part of the promotion process, but rather a "sham" designed to exclude Moore from competition and to conceal McCrary's unlawfully discriminatory animus. Beyond his assertions, however, Moore offers no evidence that would allow us to conclude that McCrary's use of the Panel was either unlawful or pretext for illegal discrimination.[3] Instead, the evidence establishes that the Panel was part of the DEA's normal promotion process. See J.A. 133-35, 544-52.

Finally, Moore argues that the Government's non-discriminatory reasons for promoting Roberts were pretext because McCrary unlawfully preselected her for the promotion. In particular, Moore alleges that McCrary promoted Roberts to Acting Unit Chief and allowed her to serve in that capacity for longer than 120 days in violation of federal law so that she could gain the experience necessary to compete with Moore and, ultimately, outperform him during the Panel's interviews. In response, the Government argues that McCrary did not violate federal law because Roberts' temporary promotion, as well as her salary increase, did not last longer than 120 days. According

---

[3] In this regard, we note that one of the three candidates recommended by the Panel shared the same race and gender as Moore, and another one of the three shared the same race.

14

to the Government, McCrary merely allowed Roberts to continue to perform the duties of Acting Unit Chief beyond 120 days to maintain continuity and reduce turmoil in the unit.

We conclude that Moore's argument regarding preselection does not establish that the Government's stated reasons were pretext for unlawful discrimination. Indeed, rather than undermining the credibility of the Government's stated reasons for not promoting Moore, his argument actually supports the Government's assertion that McCrary promoted Roberts because she was better qualified than him due, in part, to the experience she gained during her temporary promotion.

Importantly, there is no evidence that McCrary preselected Roberts on the basis of race or gender. Consequently, even if McCrary preselected Roberts by promoting her in violation of governing regulations – a question we do not decide – this type of preselection would be insufficient in this case to establish pretext. See, e.g., Anderson, 406 F.3d at 271 ("[W]hile preselection may establish that an employee was unfairly treated, it does not by itself prove racial discrimination.") (internal quotation marks omitted); Kennedy v. Landon, 598 F.2d 337, 341 (4th Cir. 1979) ("Although the pre-selection of Hardy may have violated the rules and regulations of the Department of

Corrections, it does not evidence the type of discrimination that is prohibited by Title VII.").[4]

                              IV.

As established above, the Government articulated legitimate, non-discriminatory reasons for not promoting Moore. In turn, Moore did not present sufficient evidence to establish that the Government's stated reasons were pretext for race or gender discrimination. Consequently, we affirm the district court's decision to enter summary judgment.

                                                    AFFIRMED

---

[4] Accord Mackey v. Shalala, 360 F.3d 463, 468-69 (4th Cir. 2004). Relatedly, and as noted above, Moore states that he informed McCrary that there were concerns about not rotating different DEA employees into the Acting Unit Chief position. According to Moore, he told McCrary "[i]t would be unfair if no one else was given the opportunity to serve in that capacity" and Moore purportedly responded: "Life isn't fair." J.A. 788. We conclude that this exchange is insufficient to establish that the Government's articulated explanations were pretext for unlawful discrimination because, inter alia, this evidence does not allow anything other than speculation about McCrary's motives.

GREGORY, Circuit Judge, dissenting:

The majority's opinion invites us to overlook the Government's incredible deviation from its own regulations and procedures and the Appellant's evidence that this deviation was racially motivated. Because I believe that Mr. Moore's preselection theory of pretext has significantly more merit than the majority accords it, I must respectfully dissent.

I.

The Government has a minimal burden to rebut a Title VII plaintiff's prima facie case under the McDonnell Douglas burden-shifting scheme.[1] Thus, I will assume here that the Government's explanation that Roberts was better qualified suffices as a legitimate, nondiscriminatory reason. But, even once the McDonnell Douglas presumption has dropped from the case, we must

[1] The majority's opinion assumes without deciding that Moore has established his prima facie case. In fact, Moore's prima facie burden is easily met because (1) he is a member of a protected class; (2) he applied for the SISE Unit Chief position; (3) he was qualified for that position, as evidenced by his placement on the BQL; and (4) he was rejected from that position under circumstances giving rise to an inference of discrimination. See Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 268 (4th Cir. 2005). This last element can be satisfied by demonstrating that the position was filled by a similarly qualified applicant outside the protected class, Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004) (en banc), and, in this case, the position was filled by Roberts, a Caucasian woman.

17

still deal with Moore's contention that the only reason that Roberts was more qualified than other applicants was that she was allowed to remain in the Acting Chief position for months beyond the 120 days specified in the federal regulations. The majority dismisses this theory of pretext, suggesting that Moore's "argument actually supports the Government's assertion that McCrary promoted Roberts because she was better qualified than him due, in part, to the experience she gained during her temporary promotion," supra. The majority, it seems, sees nothing wrong with the fact that the very advantages that Roberts had in the bid for the Unit Chief position were advantages that she had gained in apparent violation of federal regulations.

Office of Personnel Management regulations specify that competitive procedures must be used for all details "for more than 120 days to a higher grade position or to a position with higher promotion potential." 5 C.F.R. § 335.103(c)(ii) (2008). The DEA's own personnel manual echoes this language. (See J.A. 854 ("Temporary assignments (details) to higher-graded positions or to positions with promotion potential for more than 120 days must be made under competitive promotion procedures.").) The Government suggests that it complied with these regulations by terminating Roberts' salary increase as Acting Chief after 120 days. But the regulations are not concerned with the length of

18

non-competitive details simply because of the pay increases that accompany them. The regulations make clear that competitive procedures are needed to select longer-term detailees to both higher-graded positions and positions with "higher promotion potential." 5 C.F.R. § 335.103(c)(ii) (2008). Thus it is the increase in pay and the increased opportunity for promotion that prompted OPM to mandate that competitive procedures be used for long-term details. In other words, the regulations anticipate and seek to avoid just the outcome that we find in this case -- a situation where a detailee who was not competitively selected is allowed to stay past 120 days, albeit at her normal salary, in a position that she is essentially being groomed to assume permanently.

While the Government has suggested that there was some need to maintain continuity and to reduce turmoil while the unit was going through a reorganization, these assertions, without more, cannot justify leaving Roberts as Acting Chief for eleven months -- almost three times the length allowed under the regulations. Roberts' extra time in the Acting Chief position undoubtedly advantaged her unfairly in the promotion process. It was in these months as Acting Chief that Roberts "demonstrated [the] managerial potential" that qualified her for the Unit Chief position. (J.A. 229.) Several members of the evaluation panel that interviewed her were fellow unit chiefs, with whom she met

19

routinely for management meetings. During her time as Acting Chief, Roberts also had access to valuable leadership training opportunities that Moore and other applicants did not have.

McCrary was clearly aware that others had interest in being rotated into the Acting Chief position. Moore himself had informed McCrary that it was unfair not to allow others to serve in that capacity, to which McCrary's only response was, "Life isn't fair." (J.A. 651, 788.) This kind of insensitive and provocative response belies the Government's contention that Roberts was kept on as Acting in order to reduce turmoil in the unit.

Of course, preselection, however unfair it may be, does not by itself suffice to prove racial discrimination. See Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 271 (4th Cir. 2005). But I disagree with the majority's contention that "there is no evidence that McCrary preselected Roberts on the basis of race or gender," supra. Moore alleges in both his EEO affidavit and in his deposition testimony that, in the last twenty years, no African-Americans have been promoted above the GS-13 level in the DEA's Systems Applications Section.[2] (See J.A. 792, 670.) These statements remain uncontroverted on the

---

[2] Moore himself was promoted to a GS-13 in 1989, and he was never promoted again before his retirement in 2004.

record before us.  Moreover, of the six intra-agency candidates listed on the BQL for the Chief position, four of them -- Moore, Terry Ford, Evelyn Kelley, and Dorretha Tumlin -- were African-American.[3]  Without the experience she gained as a result of improperly being kept on as Acting Chief beyond the 120-day limit, Roberts may well have not been qualified, or at least not better qualified than others, for the permanent position.  Thus, the evidence permits an inference that McCrary, as Moore himself puts it, "knew there was a reasonable chance than an African-American would be Unit Chief, unless he made Roberts equally qualified by giving her the opportunity to gain experience, so that he could select her."[4]  (Appellant's Br. at 20.)

Based on this evidence, a jury could very well find that McCrary preselected Roberts for the Unit Chief position and that her preselection was racially motivated.  As the Supreme Court noted in St. Mary's Honor Center v. Hicks, 509 U.S. 502, 511 (1993),

---

[3] I will exclude Mark Kirksey from this analysis since he applied from outside DEA and would not have factored into McCrary's calculus of the odds of an African-American applicant being selected for the Unit Chief position at the time McCrary decided to keep Roberts on as Acting beyond the 120-day limit.

[4] It is worth noting that McCrary himself regarded Tumlin as the next most qualified for the job, and that Roberts and Tumlin tied for first in the rankings of the evaluation panel.

> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will <u>permit</u> the trier of fact to infer the ultimate fact of intentional discrimination, and . . . no additional proof of discrimination is <u>required</u>.

(internal citation and quotations omitted) (emphasis in original); <u>accord</u> <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 147 (2000); <u>Anderson</u>, 436 F.3d at 269 (4th Cir. 2005).


## II.

There is sufficient evidence under Moore's preselection theory to establish that the "legitimate, nondiscriminatory reason" that the Government proffered for promoting Roberts was pretext for racial discrimination, and I would, accordingly, reverse the district court's entry of summary judgment in favor of the Government. Thus, I dissent.

22